286 P.2d 306

STATE of New Mexico, Plaintiff-Appellee,

v.

Bob C. DOYAL, Defendant-Appellant.

No. 5831.

Supreme Court of New Mexico.

July 5, 1955.

Rehearing Denied Aug. 16, 1955.

· Ward & Carrell, Lovington, (Melvin Neal, Hobbs, G. T. Hanners, Lovington, and M. E. Noble, Las Vegas, on rehearing only), for appellant.

Richard H. Robinson, Atty. Gen., Fred M. Standley, W. R. Kegel, Asst. Attys. Gen., for appellee.

SADLER, Justice.

The question for decision is whether a district judge committed reversible error in holding for trial in the district court a minor defendant a few months past 15 years of age, charged with two murders committed at 14½ years of age, as against remanding the cases (consolidated for trial in the district court), to the juvenile court for disposition by the judge of the latter court.

The parents of the youth had been divorced when he was about one year of age. He remained in the custody of his mother in Oklahoma until about nine (9) months before the homicides, though paying occasional visits to his father in New Mexico. The mother had become converted to the Pentecostal religious sect some two years before the youth ran away from his mother and came to New Mexico to live with his father. It should be added that following the divorce of defendant's parents, his father married the sister of his former wife, mother of defendant. All three of the adults, the father, mother and step-mother had become adherents or devotees of the Pentecostal faith, sometimes known as "Holy Rollers." It was said to be a tenet of their religion to frown upon, as sinful, all ·forms of recreation and worldly pleasures; indeed, as worldly, the doing of anything except earning a living and working in the church.

Thus it was that the step-mother, and his mother as well when the youth resided with her, regarded as sinful the normal recreations of the boy such as reading westerns or novels, listening to the radio, going to picture shows, swimming or even the drinking of a coke. Accordingly, the step-mother was constantly nagging the defendant to read the bible and to get down on his knees and pray. It was her hope and aim to convert him to the Pentecostal faith with all its emotionalism.

With this as a background, on the afternoon of May 19, 1953, the young boy, who lived on a farm nine miles from Lovington, was late in getting home by reason of a little party arranged by the school bus driver for the children riding the bus, as a sort of farewell, incident to the closing of school. When the defendant got home, an argument ensued. The step-mother insisted that the youth get down on his knees and pray. When he refused she became very angry and left the house. While she was absent from the house the defendant, fearing he would be sent back to his mother in Oklahoma and being no longer able to stand the environment, decided to carry out a preconceived plan to run away from home. He loaded a rifle and when Mrs. Doyal, the step-mother, returned he forced her, at gunpoint, to write three checks in the sum of $10.00, each, and deliver them to him.

Following this he compelled Mrs. Doyal and his little half-sister, Beverly, to go to the granary. It was his plan to lock them in the granary while he made good his escape. Arriving at the granary, Mrs. Doyal suddenly turned toward him, and in a state of panic he fired the rifle indiscriminately at both Mrs. Doyal and the little half-sister, Beverly, killing them both. The step-mother was shot three times and the little girl two or three times. Both died instantly.

Following the slayings, the defendant went back into the house, pulling the lock from the door jamb to get in, notwithstanding the door through which he had left the house was still open. He took the three checks, jumped into a truck and started for Lovington. En route he seemed to have recovered his composure and, instead of fleeing as he apparently had planned originally, he turned to the sheriff's office and gave himself up to that official, telling him what had taken place. He was duly arrested. The next day, May 20, 1953, two criminal complaints were filed in the office of John W. Green, justice of the peace for precinct No. 8 in Lovington, New Mexico. each charging the accused with murder.

The justice of the peace certified the proceedings to the district court of Lea County on May 21, 1953. Informations were filed charging the defendant with the two murders on May 21, 1953. On May 25, 1953, a

hearing was held before the Honorable John R. Brand, district judge. The exact nature of the hearing is hazy. The judge stated he was not sitting as a committing magistrate but only for the purpose of determining whether this should be a district court case or remanded to the justice court. Whatever the nature of the hearing, at its conclusion and on motion of the district attorney, the court dismissed the informations on file and remanded the defendant to the justice of the peace for preliminary hearings.

These hearings were had on May 26, 1953, before John W. Green, justice of the peace. Thereafter, and without the filing of new informations, Judge Brand having been disqualified in the meantime, and the Honorable Luis E. Armijo, judge of the Fourth Judicial District, having been duly designated to preside in said matters, the accused, Bobby Doyal, entered pleas of guilty to murder in the second degree before Judge Armijo in each of the two cases. The judge imposed two sentences of 25 years, each, to run concurrently, to be served in the state penitentiary.

Thereafter, on January 30, 1954, the present counsel for accused having been retained in the meantime, a motion was filed to set aside the sentences because the informations filed May 21, 1953, having been dismissed and no new ones filed, the court was without jurisdiction to accept the accused's plea or impose sentences. This motion was sustained and on February 19, 1954, the defendant was discharged. But not for long. On the same day, two new criminal complaints were filed in the office of the above mentioned justice of the peace and immediately certified to the juvenile court. Apparently, due to the view entertained by the parties below that only the resident district judge could sit as the Juvenile Judge, the Honorable John R. Brand, judge of the juvenile court within and for Lea County, presided at the hearing in the juvenile court. Argument was had before Judge Brand and he ordered the accused bound over to the district court for trial.

Thereupon Judge Armijo, who had been present during the juvenile proceedings before Judge Brand and had heard the testimony, then took the bench as district judge. As soon as he had done so, counsel for defendant moved the district court to transfer the cases against the accused, Doyal, to the juvenile docket under the authority of 1941 Comp. § 44-110, L.1943, c. 40, § 6. The grounds for such motion were that the portion of section 4, chapter 40, Laws of 1943, purporting to vest in the juvenile and district courts "unbridled discretion" as to which persons shall be tried in the criminal court and which shall be handled as juveniles, was unconstitutional:

"1. As an unlawful delegation of legislative power to the judiciary.

"2. As depriving this defendant of due process and equal protection of the laws.

"3. Because the subject of that portion of the Act was not clearly expressed in the title.

"4. That it was an abuse of the discretion under the evidence introduced to bind this defendant over to the district court for trial for a felony."

In support of the motion, instead of again putting the witnesses on the stand, all of the evidence introduced in the juvenile proceedings was introduced in the district court, without objection. This was done because Judge Armijo had actually been present in the court room and had heard such evidence. The motion was overruled. Thereafter, a motion to quash the indictments, based on the same grounds, was filed on February 24, 1954, which was also overruled. The same motion was renewed during the jury trial.

On March 29, 1954, the two consolidated cases came on for jury trial and the defendant was found guilty of voluntary manslaughter in both cases. Sentences of confinement in the penitentiary for not less than eight nor more than ten years on the first count, and not less than three nor more than four years on the second count, were imposed. This appeal followed.

The claimed errors relied upon by counsel for defendant are four in number and to an appreciable extent are a renewal of objections to the original Juvenile Delinquency Act, as amended, and as challenged in In re Santillanes, 47 N.M. 140, 138 P.2d 503. First, it is said that portion of L.1943, c. 40, § 4, 1953 Comp. § 13–8–7, purporting to vest jurisdiction in the district court to try juveniles under the age of 18 years for crimes is unconstitutional and void, giving it into the hands of the district court, as it does, "unbridled discretion" to say which person under 18 years of age shall be tried in the juvenile courts and which in the district courts. The Act thus amounts to an unlawful delegation of legislative power to the judiciary in violation of Article 3 of the Constitution of New Mexico. Next, it is said the portion of the Act referred to, L. 1943, c. 40, § 4, is bad from a constitutional standpoint in that the discretion vested in the district court denies this defendant equal protection of the laws and due process of law in violation of Art. 2, § 18, of the Constitution of New Mexico and of the 14th Amendment to the Constitution of the United States.

The same portion of L.1943, c. 40, § 4, 1953 Comp. § 13–8–7, is likewise said to be bad from a constitutional standpoint because the subject matter thereof is not contained in the title of the Act as required by Art. 4, § 16, of the Constitution of the State of New Mexico. And, finally, it is urged the court erred below in denying defendant's motion to quash because the action of

the Hon. John R. Brand, sitting as a juvenile judge in binding the defendant over for trial in the district court on a charge of first degree murder represented an abuse of discretion by him, just as did the action of the Hon. Luis E. Armijo, sitting as the district judge amount to an abuse of discretion in his refusal to cause the cases docketed as Nos. 1710 and 1711 in the district court to be transferred to the juvenile court docket pursuant to L.1943, c. 40, § 6, 1953 Comp. § 13–8–9.

We do not think any of the challenges made by counsel for the defendant can be sustained when considered in the light of the rationale of our decision in the Santillanes case decided by us more than a decade ago. It was in that case that we called attention to a fact often overlooked in challenges to legislation of the character of Acts such as this, namely, that they are not penal statutes, that they neither prohibit nor punish crimes, but rather are designed to foster and promote the rehabilitation and welfare of minor children subject to its provisions. As said in the Santillanes case [47 N.M. 140, 138 P.2d 508]:

"Legislation establishing juvenile courts and providing methods to deal with delinquent children is a recent product of the solicitude of the law for the welfare of infants, 31 Am.Jur. 785.

\* \* \* \* \* \*

"Challenge is further made on the ground that failure to provide for an appeal, and failure to protect against double jeopardy and self-incrimination makes the act unconstitutional—that no due process of law is provided. These objections are all stricken down once we say, as we do, that this is not a criminal proceeding. The authorities generally, we might say almost universally, hold that juvenile court proceedings are entirely different in nature and character from criminal proceedings."

Perhaps the strongest attack made on the judgment reviewed arises from claim of counsel that L.1943, c. 40, § 4, 1953 Comp. § 13–8–7, is unconstitutional and void in failing, as it is claimed, to set up any standard or criterion by which to determine whether a minor brought under its terms is to be tried in the district court, or turned over to the juvenile court to be dealt with under the provisions of the Juvenile Delinquency Act. The portion of the questioned section most severely challenged reads, as follows:

"In no case shall any order, judgment or decree adjudging a person to be a juvenile delinquent or a ward of the court be deemed to be a conviction of a crime, nor shall such adjudication operate to impose any civil disability, nor shall any juvenile delinquent be deemed a criminal by reason thereof, for the reason that the entire proceed-

ings and adjudication, if any, are to be had for the rehabilitation and best interest and welfare of the juvenile delinquent, *but nothing in this Act shall be construed to prevent any person of whatever age from being charged with the commission of a felony under the laws of this state and prosecuted therefor in the District Courts of this state, and upon conviction may be sentenced to the State Penitentiary in conformity with the criminal laws of this state in the same manner as any person."* (Emphasis ours.)

In making the challenge he does, we think counsel ignores the language immediately preceding that italicized expressly declaring the entire purpose of the Act and proceedings is "for the rehabilitation and best interest and welfare of the juvenile delinquent." Is the Act to be condemned and proscribed for failure to spell out with particularity and in minute detail the factors best calculated to promote the "welfare and best interest" of the minor delinquent? We think not, at least not any more so, than were other portions of the same Act which we declined to declare void and to nullify in State v. McKinley, 53 N.M. 106, 220 P.2d 964, as being too vague and indefinite for enforcement. It is a weighing of such considerations that might influence the judge to place the case for trial in the one or the

other court. The considerations that might so move a judge are so multifarious, however, that to test validity of legislation by an omission to list them would be almost equivalent to attempting to name all the advantages of being upright and good.

Developing his attack on the portion of the Act challenged in this respect, counsel lists some seven (7) tests which he says might have been employed by the legislature as a criterion in saying whether the delinquent juvenile is to be tried in the district court. But let us take his argument in his own words. It reads:

"While the failure of the legislature to provide any procedure for trying a juvenile in the district court for crime appears to us to render that portion of Section 4, Chapter 40 of the Laws of. 1943 unconstitutional; yet, it is not the most serious defect in the Act. The legislature completely failed to set up any rule, test or guide to govern the discretion of either the juvenile court or the district court. Thus, the district or juvenile judge has the ultimate discretion. It does not provide which children shall be handled as juvenile delinquents and which tried for felonies. It does not set up any test. It does not provide that the child shall be tried for a felony if the court finds any · of the usual tests which are:

"A. That the child is incorrigible and cannot be rehabilitated. (As was done under the previous act.)

"B. That the offense is a capital offense (as in New York) or heinous or aggravated.

"C. That the child is mature so that he knows the difference between right or wrong and has sufficient emotional stability to be held responsible for his acts. (Which is substantially the law of insanity under State v. White [58 N.M. 324], 270 P.2d 727.)

"D. That the character of the child, taken into consideration with the nature of the offense and surrounding circumstances requires his trial for a felony.

"E. That the public interest and welfare will be served by his being tried for a felony. (California and Wisconsin).

"F. That the interest of the child will be served by his being tried for a felony. (California and Wisconsin).

"G. Any other fact, legal question of judicial inquiry.

"Thus, the discretion of the juvenile or district court is unlimited and no one can tell what will or has caused such judge to act. It will be noted that the above quoted provision does not set forth any procedure by which the determination shall be made that the child shall be charged and prosecuted for a felony. It does not provide whether this determination shall be made by the juvenile court, the district court, the juvenile attorney or the district attorney."

We think counsel entirely fails to consider in making this attack that our district judges who are ex officio judges of the juvenile courts are staffed by men who are learned in the law, most of them possessing years of experience in dealing with adult offenders against the laws as well as juvenile delinquents. Their knowledge of the law tells them that at common law a child under 7 years of age can not commit a crime; that between 7 and 14, a child is subject to a rebuttable presumption of incapacity to commit a crime; and that above 14 he is treated as an adult. Is it conceivable that a judge, sitting either as a judge of the district or juvenile court would presume to adjudge that a child under 7, though committing a homicide, was so incorrigible as to be beyond hope of rehabilitation and, hence, must be placed on trial in the district court for murder (Test A); or that a child, *regardless of age,* whose offense places him under Test B must be tried as a felon in the district court?

But we might go on and on. Rather, may we not fairly assume that in whatever capacity as judge he acts, he will so exercise his discretion as to try no child in the dis-

trict court for what would have been a felony if done by an adult, if extreme youth of the offender plus other facts in evidence gives reasonable promise of his rehabilitation by treatment in the juvenile court; nor at all save where the demands of society for the prevention and punishment of crime are so compelling as to leave no other alternative.

When one has finished the exhaustive and extensive brief filed by counsel for defendant herein, and we pause to pay him deserved commendation for the fidelity and ability with which he has represented his young client on this appeal, the argument boils down to one fundamental objection to our Juvenile Delinquency Act. It is that the district judge, when presented with an accused of the age of this one charged with the serious crime of homicide, has power and jurisdiction to enter but a single order and that one remanding him to custody of the juvenile court for the hearing and disposition of his case. Once it is agreed there is discretion with the trial judge as to where the accused shall be tried, the defendant loses the main point relied upon for reversal. Admittedly, the evidence was conflicting on the issue as to where from standpoint of the youth's best interest and that of society, he should be tried.

Were this contention of defendant's counsel sustained, there would be little left of the Juvenile Delinquency Act for enforcement. Never, since our legislature enacted the first Juvenile Delinquency Act, has it attempted to deny district courts their traditional and constitutional power to place on trial one accused of having committed a felony, merely because his age at the time of the offense placed him below the maximum named in the statute for juvenile delinquents. At the present time 18 years of age is that maximum. Compare State v. McKinley, supra.

We have given careful consideration to all the arguments and contentions advanced by counsel for the defendant and give it as our settled judgment that the trial judge did not err in holding the accused for trial in the district court. The question of jurisdiction alone in that court to try him for any felony can not be questioned. State v. McKinley, supra. And, in so far as the matter became one dependent upon a proper exercise of discretion, if it did, a review of the applicable testimony on the decisive issue fails to create a doubt but that the district judge made a correct ruling. Compare State ex rel. Naramore v. Hensley, District Judge, 53 N.M. 308, 207 P.2d 529.

Indeed, one has only to read and analyze our former decisions in In re Santillanes, supra; State v. McKinley, and Naramore v. Hensley, both supra, and the rationale

upon which those decisions rest to be well satisfied that the trial court did not err in holding this defendant for trial in the district court. Our conclusion to this effect resolves all questions presented, save the third point challenging constitutionality of the questioned portion of 1953 Comp. § 13-8-7 because the subject matter thereof is not contained in the title of the Act as required by Art. 4, § 16, of the Constitution. The argument made in support of this claim of error fails to satisfy us it has merit. Accordingly, it is denied.

Before closing, mention should be made of the fact that the defendant was of unusual size and weight for one of his age, giving him an appearance of maturity which his actual age belied. This was something, of course, which both the judge and jury could observe. It was not a factor, however, which was calculated to affect the judge's ruling upon the evidence as to where from standpoint of society and the youth, it was the part of wisdom to place him on trial.

The crimes of which the defendant stands convicted are atrocious and heinous in the extreme. The fact that the verdict was that of manslaughter rather than murder is proof enough that the jury gave full weight to the accused's youth as well as to every circumstance tending in any degree to mitigate the enormity of his offense. We find nothing in the record of the defendant's trial to justify us in overturning the sentence imposed. Accordingly, the judgments will stand affirmed.

It is so ordered.

COMPTON, C. J., LUJAN and Mc-GHEE, JJ., concur.

KIKER, J., not participating.